CIACCIO, Judge.
Eugene Barriffe, Jr. and Errol Ware filed suit to recover damages against Mr. and Mrs. Luis Ortiz for alleged acts of invasion of privacy and negligence. Plaintiffs also sued Luis Ortiz for unlawful eviction. A jury rendered judgment in favor of the plaintiffs and awarded each the sum of $250,000. The defendants appeal alleging that the verdict is contrary to the law and evidence and further, that the trial court erred in refusing to grant their motion for a directed verdict, motion for a judgment notwithstanding the verdict, motion for a new trial and in the alternative, their motion for remittitur. Finding merit in the defendant’s contention that the jury verdict is contrary to the law and evidence, we reverse the trial court judgment.
Luis Ortiz, Eugene Barriffe, Jr. and Errol Ware were associated in the practice of law, operating from an office owned by a law corporation comprised of Ortiz and Barriffe.
Barriffe and Ware claim that their privacy was invaded by Mrs. Ortiz when she illegally taped their private telephone conversations in the law office. They claim additional damages because Mrs. Ortiz allegedly disclosed the contents of the conversations to unauthorized persons. They also claim that Luis Ortiz is liable for his wife’s actions. Finally, they sue Luis Ortiz for wrongful eviction from their law offices.
The defendants deny the taping of Bar-riffe and Ware’s telephone conversations. Luis Ortiz contends there was no wrongful eviction but merely the proper exercise of his legal rights as owner of the building.

Verdict Contrary To The Law and Evidence:

Defendants contend that plaintiffs failed to prove their case by a preponderance of the evidence and thus the jury verdict was contrary to the law and evidence.
The plaintiff has the burden of proving every element of his cause of action. Tillman v. Massey, 445 So.2d 749 (La.App., 4th Cir.,1984), writ den., 446 *373 So.2d 743 (La.1984). That is, in addition to proving the tortious conduct, the plaintiff must establish causation between that which the defendants did or failed to do and the damages resulting from the act or omission. See: Patterson v. Garic, 411 So.2d 1091 (La.App., 4th Cir., 1982). Tor-tious conduct must be established with reasonable certainty and by a preponderance of the evidence and a mere showing of possibility or probability is not sufficient. See: Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971); Derouen v. State Farm Mutual Auto Insurance Co., 445 So.2d 139 (La.App., 3rd Cir.,1984). The findings of the trial court will not be taken as conclusive on the issue of the probative value of the testimony. Blue Streak Enterprises v. Cherrie, 263 So.2d 734 (La.App., 4th Cir.,1972). Thus, in an evaluation of the sufficiency or preponderance of the evidence the manifest error rule is not applicable. Honeywell Inc. v. Courtesy Discount House, 413 So.2d 222 (La.App., 4th Cir., 1982); Blue Streak Enterprises v. Cherrie, supra; Patterson v. Garic, supra.
In this suit for damages the plaintiff made the following allegations:
4.
On or about February 1, 1982, and continuing through the period of March 1, 1982, the defendants, Luis Ortiz and Alma Ortiz, have engaged individually and in concert with each other in negligent and intentional conduct and activities which have irreparably damaged plaintiffs, Eugene Barriffe, Jr. and Errol Ware, in the following respects:
a)On or about February 1st, 1982 through February 12, 1982, defendant, Alma Ortiz, without the knowledge or consent of Eugene Barriffe, Jr. and Errol Ware, installed a tap[p]ing device on the business telephones of Eugene Barriffe, Jr. and Errol Ware and taped all conversations carried over these telephones inlcuding those taking place between Eugene Barriffe, Jr. and Errol Ware and their clients; upon information and belief, plaintiffs allege that said defendant, Alma Ortiz, forwarded these tapes to officials at the United States Department of Immigration and the U.S. Attorney, as well as other persons and/or agencies, upon information and belief, plaintiffs allege that the defendant, Luis Ortiz, had knowledge that his wife, Alma Ortiz, was in fact taping telephone conversations of his law partners and your plaintiffs herein, Eugene Barriffe, Jr. and Errol Ware, and did not remove these taping devices nor reframe his wife from her taping activities; plaintiffs aver that defendant herein, Luis Ortiz, knew that Alma Ortiz had taped conversations of his previous law partners and had a propensity to tape law office telephones whenever she was engaged in a domestic fight with your defendant herein, Luis Ortiz.
b) That the defendant, Luis Ortiz, was informed of the fact that his wife had in fact taped your plaintiffs but did nothing to remove his wife and defendant herein, Alma Ortiz, from said law office and furthermore failed to warn your petitioners that their activities were in fact under surveillance by defendant herein, Alma Ortiz, and that their office telephones were taped;
c) That defendant, Alma Ortiz, discussed plaintiffs taped telephone conversations with attorneys and other persons. The aforementioned actions of defendants herein, Luis Ortiz and Alma Ortiz, have violated the confidentiality existing between plaintiffs and their clients and have exposed your plaintiffs to liability for damages.
* jfs * * * *
The jury found that there had been an invasion of the plaintiffs’ right to privacy by the actions of the defendants. The cause of action for invasion of privacy was discussed by the Louisiana Supreme Court, in Parish National Bank v. Lane, 397 So.2d 1282 at 1285-1286 (La.,1981):
The right to privacy, first defined by Samuel Warren and Louis Brandéis as the “right to be let alone,” has been recognized by our courts since 1905. In *374 that year, this court declared that: “Every one who does not violate the law can insist upon being let alone (the right of privacy)_” Itzkovitch v. Whitaker, 115 La. 479, 482, 39 So. 499, 500 (1905). Later decisions held that violation of the right was a tort under C.C. 2315. Pack v. Wise, 155 So.2d 909 (La.App. 3d Cir.1963); Quina v. Robert’s, 16 So.2d 558 (La.App.Orl.1944). The Louisiana Constitution adopted in 1974 specifically states that: “Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy_” La.Const. of 1974, Art. 1, Section 5.
The determination of whether a person’s conduct constitutes an invasion of privacy depends upon the facts and circumstances of each case. Roshto v. Hebert, 439 So.2d 428 (La.,1983).
The facts surrounding the defendants’ alleged tortious conduct are in conflict.
During the five day trial of this matter nineteen witnesses testified. The following testimony was offered regarding the alleged taping incidents:
Plaintiffs, Barriffe and Ware, testified that the defendants were experiencing marital difficulties during the first months of 1982; that Mrs. Ortiz, who worked in the law office, in an attempt to secure evidence of her husband’s extra-marital affairs for use as a basis for her divorce, recorded telephone conversations at the law firm of Ortiz and Barriffe from February 1, 1982, through March 1, 1982; that, in the process, she taped confidential conversations conducted in the office by the attorneys and their clients. According to the plaintiffs, Mrs. Ortiz intercepted a conversation between Eugene Barriffe and Mrs. Rafeal Monge, the wife of an accused drug dealer. In the conversations, Barriffe transmitted to Mrs. Monge certain information concerning her husband’s criminal prosecution. The information had been secured from the United States Attorney and included, among other matters, the fact that Mrs. Monge and the alleged target of the investigation, one Mr. Acevado, were under sur-veillence. According to the plaintiffs, Mrs. Ortiz disclosed this confidential information to the United States Department of Immigration and the United States Attorney’s Office. As a result of this leak of information the plaintiffs contend that Acevado was shot 15 times and his body stuffed in the trunk of his car, the negotiations in the Monge case broke down, and the plaintiffs began to fear for their lives. The plaintiffs alleged that Mr. Ortiz knew of his wife’s phone “tapping” and failed to restrain her. According to plaintiffs, Mr. Ortiz also attempted to use some of their conversations, which involved certain personal relationships with persons other than their respective spouses, against them as a form of blackmail.
Plaintiffs attempted to prove their claim that Mrs. Ortiz taped their telephone conversations for approximately one month by offering evidence regarding two specific conversations, Mr. Barriffe’s conversation with a female attorney friend and his conversation with the wife of a client accused of dealing in drugs.
Barriffe testified that he viewed the alleged taping of his conversations with a female attorney as a form of blackmail which would be used by the defendant to disrupt the harmony between the witness and his wife, thus inhibiting the witness’ financial ability to buy the building which housed the parties’ law office. He also felt that the taping incident was a conspiracy to break up the firm and, in particular, to rid the firm of Mr. Ware and a secretary, Ms. Cobalar, and to bring Mrs. Ortiz back into the firm.
Barriffe alleged that Mr. Ortiz made ongoing threats against him and other firm members by telling them he would use the contents of the alleged tapes against them. These threats lasted from February through October of 1982 and they were made in the presence of the plaintiffs, Mr. Siegeltuch, another attorney in the building, and Ms. Cobalar. According to Bar-riffe, in addition to the threats by Mr. Ortiz and the admission by Mrs. Ortiz of the *375 taping, he surmised that Mrs. Ortiz had taped his conversation in the law office because of certain events that transpired after the alleged taping. That is, Barriffe alleged that Luis Ortiz’s knowledge of his conversation with a female attorney was proof of the taping.
Additionally, during this time Barriffe and Errol Ware were engaged in the defense of criminal charges pending in the United States District Court against Rafael Monge, an alleged drug dealer. Barriffe testified that he spoke to Mrs. Monge and transmitted to her information given to him by the United States Attorney concerning her husband, and advised her that the United States Attorney had her and Acevado under surveillence. There were ongoing negotiations with the U.S. Attorney’s office concerning this ease. Barriffe reasoned that these negotiations were thwarted and the target of this drug investigation, Mr. Acevado, was shot 15 times and his body stuffed in a car trunk as a result of Bar-riffe’s case strategy contained in the tapes being leaked to the federal authorities by Mrs. Ortiz. Barriffe felt that this case was important to the federal government because it was part of the large drug investigation of the “Black Tuna Gang” which, according to Barriffe, operated out of Miami and which has resulted in the killing of four lawyers and countless witnesses.
Errol Ware, an associate in the law firm of Ortiz & Barriffe, testified that he handled criminal cases in that firm. He stated that he knew Mrs. Ortiz because she performed secretarial duties at the firm. He was aware of the marital problems of Mr. and Mrs. Ortiz. Ware testified that Mrs. Ortiz told him that she had taped the phones and as a result she had something on Barriffe and Siegeltuch. He also stated that Mrs. Ortiz revealed to him that she had delivered the tapes to the U.S. Attorney’s office and the Department of Immigration. Ware alleged that even though the Immigration Department could not use the tapes because they were illegally obtained, he felt that the law enforcement people would use the information. Ware said that he told Mr. Ortiz about his wife’s actions and Ortiz thought it was a joke. He said that Mr. Ortiz had made statements that as a result of the taping he had “something on everyone” in the office.
Ware stated that he felt the United States governmental authorities had listened to the tapes because an investigation was initiated. Since Ware has political aspirations he felt that such an investigation could be damaging in that it would show his association with drug dealers.
Ware identified Acevado as Monge’s drug supplier, and he associated the death of Acevado with the leak of information from the tapes. He felt that leaks of this type of information could result in his being blamed and thus his being hurt. Ware felt that if Acevado could be killed because of the leak of information he also could be killed.
Mrs. Eugene Barriffe testified that Mrs. Ortiz told her that she had taped the office phones for some time and that as a result she had something on everyone and she was taking the tapes to the immigration office and to other attorneys. Mrs. Bar-riffe stated that she neither saw nor heard the tapes but that Mrs. Ortiz told her that the tapes contained information about her husband’s affair with a female attorney and also certain information regarding Errol Ware and Ron Siegeltuch. She also stated that Mr. Ortiz admitted to her that he had heard the tape.
Mrs. Barriffe further testified that her husband had been involved in a big criminal case at the time. He became very upset and cautious about her arid his daughter after Acevado’s death. This witness also stated that she had fired Patricia Bran, a secretary in the law office, because Bran knew of the taping and did not inform Mr. Barriffe.
Mrs. Barriffe also testified that there was general agreement within the office that Mrs. Ortiz should not be working there. She also stated that Ms. Cobalar indicated to her that she knew of the taping.
*376 The defendants deny this account of the facts.
Defendant, Alma Ortiz, testified that she had worked full time in her husband’s law office in 1981 and 1982 performing receptionist and secretarial duties. Although she had twice filed for separation from Mr. Ortiz, she was, at the time of this incident, living with him. She stated that she suspected in March, 1982, that her husband was having an extra-marital affair. According to Mrs. Ortiz, this fact had also been suggested to her by Eugene Barriffe and that he encouraged her to tape her husband’s telephone in order to secure proof of this affair. She discussed this matter with her friend, Marta Carbonell, who supplied Mrs. Ortiz with a taping device and instructed her regarding its use.
On Friday, March 12, 1982, Mrs. Ortiz overheard her husband talking romantically on the office telephone. The secretary and the defendants were the only other people in the office at the time. Mrs. Ortiz went back to the secretary’s desk and set up the taping device. She taped only this one Spanish language conversation of her husband with his female acquaintance. The taping lasted between 20-25 minutes. Mrs. Ortiz then disconnected the taping device from the phone and put it in her purse. She stated that she only taped her husband this one time and that she never taped any conversations of Mr. Barriffe or Mr. Ware.
Thereafter, Mrs. Ortiz contacted Iris Reyes whose stepfather, Hector Soya, was married to the woman with whom Luis Ortiz had had this conversation. Mrs. Ortiz testified that she brought the tape to Ms. Reyes, who was working at Werlein’s music store, in order to demonstrate to her the kind of woman her stepfather had married. The tape was played for Ms. Reyes in a booth at Werlein’s where Ms. Reyes heard the tape with the aid of earphones.
The tape was taken to the United States Department of Immigration on the next day. Although she met with Mr. Cadman, a United States Department of Immigration employee, she never showed him the tape. She did however tell the authorities at the Immigration Department that her husband had arranged a marriage for his female companion in order to keep her in this country. Mrs. Ortiz stated that she knew that if she got this woman deported, her husband’s affair would end.
On approximately the following Thursday, Mrs. Ortiz confronted her husband with the fact that she knew he was having an affair, and she presented him with the tape of the conversation between him and his female friend. Mr. Ortiz was so angered by this incident that he destroyed the tape without listening to it.
Thereafter, Mrs. Ortiz went to see Cor-win Reed, an attorney, in order to file for a divorce. She also terminated her employment with the Ortiz law firm. She later reconciled with her husband and returned to his law office at the end of 1982 when the law corporation was in the process of being dissolved.
Luis Ortiz testified that he had attempted to have an affair in early 1982 and that he told Eugene Barriffe of this attempt. He stated that he had never been told that his wife was engaged in taping conversations in the law office and that he had not been told to ask his wife to leave the law office. He further stated that he was not told that his wife had distributed the tapes. Mr. Ortiz testified that his wife told him that the tape was of a conversation between him and his female companion. He destroyed the tape and the taping device without listening to the contents of the tape. He also did not play the tape for his children nor did he threaten anyone with the contents of the tape. Upon learning of the tape’s contents from his wife, Luis Ortiz asked her to leave the office and not return. She thereafter filed suit against him for separation. Mr. Ortiz stated that the only information he received about the taping incident allegedly involving the Monge case was information received from the plaintiffs during trial.
Iris Reyes testified that she had been contacted by Mrs. Ortiz about two years ago. At that time, while working at Wer- *377 lein’s, she had been called downstairs to listen to a tape of a conversation between her stepfather’s wife and Mrs. Ortiz’s husband. She stated that she did not hear any other voices on the tape. Mrs. Ortiz wanted Ms. Reyes' to listen to this tape in order to give the information to Reyes’ stepfather. Reyes stated that Ortiz told her that she wanted to take the tape to the Department of Immigration, but she did not know whether this had been done.
Walter Cadman testified that he had been employed for approximately 8 years with the United States Department of Immigration and Naturalization. He worked in the New Orleans office until about three weeks before this trial.
Mr. Cadman stated that he met Mrs. Ortiz in early 1982 when she came to complain that her husband was having an affair with an illegal alien and that he was attempting to arrange a marriage for the alien. Mrs. Ortiz told him of the existence of a tape between her husband and this female alien. Mr. Cadman never saw nor heard this tape, as, following a conversation with the U.S. Attorney and his supervisor, Eugene Botts, Cadman declined to take or listen to the tape. Thus, he did not know the length or contents of the tape although he was told that the tape indicated Mr. Ortiz’s affair and his agreement to arrange a marriage. He stated that he did not discuss any other tape nor did he have any knowledge whether the tape was given to any law enforcement agency. Mr. Cadman stated that there was no criminal investigation conducted of Mr. Ortiz. He also stated that certain inquiries were initiated as a result of statements made by Barriffe in 1983 or 1984, but Barriffe’s complaints regarding Ortiz were found to be groundless.
Eugene Botts, Walter Cadman’s supervisor, testified that Cadman had reported to him the visit by Mrs. Ortiz. The witness corroborated the facts as testified to by Walter Cadman. He also stated that he did not see or hear the tape. Further, he stated that Cadman had told him that he had not listened to the tape. Botts also testified that his Department had not conducted any official investigation as a result of this incident.
Marta Carbonell, a friend of Mrs. Ortiz, testified that Mrs. Ortiz was angry because she suspected Mr. Ortiz was having an affair. Carbonell stated that she instructed Alma Ortiz in the use of a taping device, which she supplied to the defendant. She only knew that Mrs. Ortiz had taped her husband’s conversation with another woman. She was not aware that the defendant took the tape to the Immigration Department. She also did not know whether Mrs. Ortiz had taped any other conversations.
Corwin Reed, Mrs. Ortiz’s divorce attorney, testified that he had represented her in two separation suits against her husband. Mrs. Ortiz had told him her husband had a date with another woman but he did not know how she got her information. He did not have a tape nor did he see or hear one.
Patricia Bran, a secretary at the Law Firm of Ortiz & Barriffe during the time of this incident, testified that she never saw Mrs. Ortiz tape anything. Maria Cobalar, another secretary, also testified that she never saw Mrs. Ortiz taping any conversations nor did she hear the defendant say she had taped any conversations. Cobalar also stated that she had never heard any tapes, nor had she heard Luis Ortiz threaten anyone with taped conversations.
Victor Ortiz was an attorney in the Ortiz firm during February 1982. He learned of the taping incident from Eugene Barriffe who advised him that Mrs. Ortiz had taped her husband. This witness did not know the duration of the taping or whether any of the rest of the office was taped. He never heard Mr. Ortiz threaten anyone in the office concerning the tapes. He felt the taping talk was gossip.
Ron Siegeltuch was an attorney who was associated with the Ortiz firm in February 1982. He testified that he had heard of the supposed tapes but that he never saw or heard them. He also never heard Mr. Ortiz make threats regarding the taped conversation. He did hear Mrs. Ortiz state that she *378 had a tape of a conversation between her husband and another woman. The witness stated that he did not know how long the taping occurred or whether he was present during its occurrence. He had not been told that his conversation was taped. Sie-geltuch did speak to Mr. Cadman, with the Department of Immigration, regarding the tape. He was advised that Cadman never heard the tape.
Jules Romanach, a former associate of the Ortiz firm, testified that he was not at the firm after December, 1979 and that he did not know anything about the alleged taping incident.
A review of this evidence clearly indicates that the plaintiffs did not prove, by a preponderance of the evidence, that the “defendant’s conduct [was] unreasonable and seriously interfere[d] with the plaintiff[’s] privacy interest.” Parish National Bank v. Lane, supra.
The only persons who actually heard the taped conversation were Mrs. Ortiz and Mrs. Reyes. Every other witness denied having heard the tape. Mrs. Ortiz testified that the only conversation she taped was one in Spanish by her husband with his female companion. She specifically denied taping Barriffe or Ware.
Her testimony was corroborated by Iris Reyes who testified that she heard only one tape recording of a conversation between Mr. Ortiz and her step-father’s wife, and it did not involve plaintiffs.
Although the plaintiffs alleged that their conversations were taped, they presented no probative evidence of that fact. The evidence presented on that issue amounted to no more than hearsay, speculation, and conjecture. Eugene Barriffe admitted that he never saw nor heard the tapes and his only knowledge of their contents was derived from Mrs. Ortiz. However, Mrs. Ortiz specifically denied taping anyone except her husband.
Although Barriffe concludes that other conversations must have been taped because of events that occurred following this alleged invasion of privacy, he failed to present direct or circumstantial evidence to corroborate his testimony. That is, Bar-riffe reasons that his conversation with a female attorney could not have been known or used by Mr. Ortiz as blackmail had it not been overheard and taped by Mrs. Ortiz. However, Mr. Ortiz denied listening to any taped conversations, and the female attorney who could have corroborated the existence of the telephone conversation was not produced as a witness at the trial.
Barriffe also reasons that his dealings with the United States Attorney’s Office on the Monge case were frustrated by the leak of the contents of his conversation with Mrs. Monge which he contends was taped by Mrs. Ortiz. No proof of this fact was presented. The United States Attorney handling the Monge case was not called to testify at the trial in order to corroborate Barriffe’s claim. Mrs. Ortiz denied that the conversation was taped, and she also denied delivery of any tape to the United States Attorney’s Office.
Barriffe further contends that the target of the Monge investigation, Mr. Acevado, was revealed by the tape and that this tape was distributed to the Federal authorities. He does not, however, explain the nature of the alleged conversation and the causal connection between its alleged distribution and the murder of Acevado.
Likewise, the basis of Ware’s alleged cause of action for invasion of privacy was secondhand information supposedly derived from the defendants, which information the defendants denied. This cause of action relies upon Ware’s unsubstantiated speculation regarding the existence of an alleged governmental investigation and the death of Acevado, the alleged target of the Monge drug investigation. The death of Acevado was never explained nor connected by any evidence, direct or circumstantial, to the alleged taping incident. The federal authorities called to testify, Walter Cadman and Eugene Botts, specifically denied the allegation that a federal investigation of the plaintiffs had occurred.
Mrs. Barriffe’s belief that the plaintiffs’ confidential conversations had been taped *379 rested upon alleged admissions by Mrs. Ortiz and threats she contends were made by Mr. Ortiz. Mrs. Ortiz denied any admissions and Mr. Ortiz denied the existence of any threats. Mr. Ortiz’s position was corroborated by Ron Siegeltuch, an attorney, and by Patricia Bran, a secretary, both of whom worked for the law firm during the period of time the threats were claimed to have been made.
Both plaintiffs admitted that they neither heard nor saw the alleged tapes and that their only knowledge of the contents of the tapes was derived from conversations with others. The plaintiffs did not produce any witnesses who had heard the tapes nor did they produce any witnesses who could support their position with probative evidence of even a circumstantial nature.
Plaintiffs argue that their testimony regarding the tapes although hearsay, was probative and that defendants failed to object when the evidence was elicited at trial. We find this not to be the ease. The record is replete with objections by defense counsel to this and other repeated incidents of hearsay evidence. As hearsay, properly objected to by counsel, this evidence was of no probative effect. Such evidence was erroneously admitted over the objections of the defendant.
Accordingly, we find that the plaintiffs failed to sustain their burden of proof for the alleged invasions of privacy, and, therefore, the verdict of the jury was contrary to the weight and probative effect of the evidence, and was erroneous.

Wrongful Eviction

Our review of the jury interrogatories indicates the jury did not pass upon the issue of wrongful eviction of the plaintiffs by Mr. Ortiz. However, our evaluation of the evidence indicates that the plaintiffs failed to prove a cause of action for wrongful eviction.
In their petition, plaintiffs make the following allegations concerning their alleged wrongful eviction:
6A
Plaintiff, Eugene Barriffe, Jr., further avers that on March 1, 1983, defendant, Luis Ortiz, without notice or consent, caused the locks to be changed on the premises at 223 South Broad St., thus denying plaintiff access to the premises of which he was co-owner and in which his law offices were located, thus causing plaintiff professional anxiety and embarrassment.
6B
Additionally, plaintiff, Eugene Barriffe, Jr., was denied access to the furnishings and office equipment on the premises at 223 South Broad and of which furnishings and equipment he was co-owner, causing plaintiff to incur expenditures in the sum of $5,000.00 to obtain new equipment and locate his practice elsewhere.
6C
It is further avered that when clients came to the premises at 223 South Broad seeking the legal services of plaintiff, Eugene Barriffe, Jr., defendant, Luis Ortiz, denied knowledge of plaintiff’s whereabouts and sought to entice clients to retain him as their counsel.
6D
The aforementioned actions of the defendant, Luis Ortiz, caused plaintiff, Eugene Barriffe, Jr., professional anxiety, embarrassment, inconvenience and financial loss and interfered with his professional relationship with his clients.
6E
Plaintiff, Errol Ware, avers that on March 1, 1983, defendant, Luis Ortiz, by changing the locks on the office at 223 South Broad Street, did prevent plaintiff from having access to his personal property in said office; that defendant also denied knowledge of plaintiff’s whereabouts when clients came seeking his services and, further, sought to entice *380 plaintiff’s clients into retaining the defendant as their counsel, all of which caused plaintiff professional anxiety and loss, inconvenience and financial expenditures.
In support of this claim, Eugene Barriffe testified that he filed a suit to dissolve the law firm on December 21, 1982. The building was auctioned February 23, 1983 and Luis Ortiz bought the building. Barriffe stated that the act of sale for the building occurred on March 4, 1983. Although the purchaser paid the purchase price to the notary on that date, Barriffe complains that he was not paid at that time. Apparently the proceeds of the sale were turned over to the judicial liquidator for later distribution. He admitted returning to the building after the auction, and on one occasion he retrieved his chair. He found out the night before March 1, 1983 that the locks on the building had been changed. He then called Ortiz and complained that although he was an owner of the building, he no longer had keys to the building and still had property in the building.
He stated that his clients were not referred to him, although he admitted he transferred one of the two former phone numbers to his new place of practice. He also testified that although he had planned to move in April, he was compelled to move in March. This necessitated his finding an office immediately as well as incurring the expenses for rental and deposit, office furniture, equipment and supplies. He was also compelled to notify clients of his new address.
Mrs. Barriffe corrobated the testimony of her husband concerning the lockout. She also stated that she spoke to Luis Ortiz who advised her that he had the locks changed and laughed when she told him that the Barriffes were still one-half owners. She also attested to the fact that she and her husband had to take immediate steps to secure an office and equipment. She testified that the cash from the sale of the building was not received until several weeks after the lockout. The auction did take place some time before the locks were changed, and she could not recall whether they had notified Barriffe’s clients, at the time of the filing of the dissolution, that they would be moving.
Errol Ware testified that he arrived at the office early on the morning of March 1, 1983 and discovered that his key no longer fit the locks. He stated that he discussed this matter with Ortiz, who advised Ware that he owned the building. He stated that he attempted to remove his property from the building but he was denied admittance. He stated that he still has not received his framed documents and plaques valued at $900. Around the time the building was auctioned he did however remove all but his closed files. He alleges that as a result of this incident he was unable to get in touch with his clients. He denied receiving notice from an associate in the law office to remove his property. Ware said that the liquidator recently advised him to remove hi's property from the office. He went to the office and then removed two books. He stated that Ron Siegeltuch did not know what had become of Ware’s belongings and refused to allow Ware to look for them. Ware stated that he had to physically remove Siegeltuch in order to get to his personal belongings. He testified that he did not receive a letter notifying him to remove his property from the law office, as there was no reason for him not to pick up these things.
Ron Siegeltuch testified that Ware had asked about his property but no physical confrontation occurred between them. He stated that Ware had come to retrieve books and diplomas and also asked about a chair. Siegeltuch stated that he did not know where the chair and diplomas were located. Thereafter, Siegeltuch wrote Ware a letter advising him that he would have to remove his personal items from Ortiz’ law office but Ware did not respond. Siegeltuch stated that on the day after the auction there was a desk, chair and file cabinet in Barriffe’s office and a chair and diploma in Ware’s office. He stated that he answered some calls directed to Ware and he referred those clients to the new *381 law office where Ware was practicing. He also referred Barriffe’s clients to Barriffe’s new office.
Secretary, Maria Cobalar, testified that the building that housed the law office was sold on February 24, 1983 and was purchased by Ortiz, Orrett and Siegeltuch. She went to the office at 8:15 A.M. on the day after the sale. She noticed Barriffe’s office was open, his file cabinet was empty and his personal items and those of Errol Ware were gone. There had been only two keys to the office, one of which was held by her and the other by Barriffe. She stated that Barriffe continued to come to the office just as if he worked there. He came back several times after the sale to accept client calls and remove his files. On the last day Barriffe removed his chair. She stated that Barriffe took his office supplies and books when he moved to his new office. Cobalar testified that although the locks were changed on the back door on March 4th, the law office was open each day during the week from 6:30 a.m. until 7 p.m. Cobalar stated that she typed and mailed the letter which advised Ware to pick up his personal items from the office. She did not, however, see Ware come to pick up those items.
Carl Selenberg was the notary who passed the act of sale. He stated the property was bid in on February 21, 1983 and the act of sale occurred on March 4, 1983. At the time of the sale he received $81,000 which was not forwarded to Barriffe but to the liquidator of the law corporation.
Antionette Bocage, a secretary in the Darleen Jacobs’ law office, testified that Ware came to their office on March 2,1983. He began to practice law from that office. Bocage stated that she opened Ware’s mail and did not receive any correspondence from the Ortiz office advising Ware to remove his property. She stated further that Ware had complained to her that he could not get his personal items, particularly his chair and plaques, from that law office. She also stated that Ware’s clients complained to her that they were unable to get in touch with Ware.
Eddie Stewart was a friend of Errol Ware for ten years. He stated that Ware left the Ortiz firm on March 2, 1983 and joined Jacobs. Stewart stated that Ware advised him that he was locked out of the Ortiz building without his personal property. He went back with Ware several times to the office, after the locks were changed, and they were unable to enter the building. He stated that Ware complained to him that his phone calls were not referred to his new office.
Jonathan Lake was an attorney who leased office space to Barriffe at a rental of $500 per month. He received the first check on February 28th. The lease dated March 1, 1982 was signed March 2, 1982. Lake stated that Barriffe came to the office with a chair and rented other furniture. He stated that Barriffe’s telephone calls were transferred but he had trouble getting his calls. He said Barriffe’s mail was still going to the Ortiz office but he didn’t know if the phone calls went there. He also stated that a lot of Ware’s calls were received in Lake’s office.
Luis Ortiz testified that in early March, 1983 he changed the locks on his building. Ortiz did this to insure the safety of his building and its contents after coming to the office one night and finding the door unlocked. At the time that this occurred Barriffe had already removed all of his files and personal belongings to his new office at 215 South Broad Street.
The evidence is conflicting as to the exact date the locks were changed on the law office. It is clear, however, that the locks were changed three months after Barriffe filed to partition the law firm, in the month following the public auction of the building to Ortiz and in close proximity to the date of the exeuction of the formal act of sale of the building.
The plaintiffs did not prove actual or constructive eviction. To the contrary, the evidence preponderates in favor of a showing that plaintiffs were not denied access to the building but did visit the building on a number of occasions during the time in question.
*382 Under these circumstances we find that the plaintiffs failed to prove by a preponderance of the evidence that they were wrongfully evicted. They are not, therefore, entitled to recover any damages for same.

Evidence Submitted on Motion for New Trial

Following the conclusion of the trial, the defendants filed motions for a new trial, for judgment notwithstanding the verdict or in the alternative, a motion for remit-titur. The motions were summarily denied by the trial court and the defendants sought relief from this Court through the exercise of its supervisory jurisdiction. This Court ordered the district court to conduct a contradictory hearing on the motions, which it did, before again denying the defendants’ motions.
The evidence produced at the hearing on the motion for a new trial further convinces us that the verdict rendered by the jury (without the benefit of this evidence) was clearly contrary to the law and evidence. At the motion hearings, the following additional evidence was produced:
Rafael Monge testified that he was a client of the Ortiz firm who had been represented by Eugene Barriffe in a criminal case. He stated that he neither knew nor was represented by Errol Ware. He also never spoke to Ware nor saw him in court. He pled guilty to criminal drug charges on February 11, 1982 and remained in jail in Texas until June 11, 1984.
Monge stated that he had sold his grocery to Mr. Acevado and that Monge later repurchased the business. Thus, he would see Acevado when he would come to collect Monge’s mortgage payment on the store. He later learned that Acevado had been killed. He also testified that Acevado was not his drug source.
Monge never told Barriffe his drug source nor was he told that his grocery was under surveillence. He also did not give permission for his conversations to be taped nor did he know of a taping. Monge stated he had never heard of the “Black Tuna Gang.” Monge had never been told that any of his conversations were taped.
Aminda Monge is Rafael Monge’s wife. She testified that she went to see Mr. Ortiz following her husband’s 1981 cocaine arrest. She stated that Barriffe was in the firm at the time and was recommended by Ortiz. She did not know, nor did she ever talk to, Errol Ware. She also stated she had never talked to Barriffe over the telephone concerning her husband’s case and her only conversations with him on this matter were during court appearances. She also was not told that her business place was under surveillence.
Mrs. Monge never heard of the “Black Tuna Gang.” She stated that she never discussed Mr. Acevado with Barriffe. She knew Acevado from the sale and repurchase of their grocery. She did not know until later that he was involved with drugs and she did not know his drug source. She did read that he had been shot and his body placed in his car trunk. Mrs. Monge was not warned nor did she know if her telephone conversations were taped.
Lindsey Larson was the Assistant United States Attorney in charge of the Monge prosecution. He stated that Barriffe was present with the defendant at the hearing in this case. He did see Ware one day in his office with Barriffe.
Larson did not know Acevado nor had he heard the name until a few months before. Larson never heard of the “Black Tuna Gang” in relation to Monge and he did not know Monge’s drug source. He did not tell Ware or Barriffe that Acevado was a part of the Monge investigation. He did not know whether Monge’s grocery had been under surveillence. However, if it had been, he would not have told the defendant’s attorney. He had not talked to Bar-riffe about the “Black Tuna Gang” nor did Larson tell Barriffe that four attorneys were killed during the Black Tuna investigation.
Larson further stated that he had never discussed the Monge case with Mrs. Ortiz or with Mr. Cadman. He did not know of any tape involving the Monge case and Mr. Cadman never brought him any tapes.
Richard Woodfork was the United States Drug Enforcement Agent involved in the *383 Monge case. He stated that Eugene Bar-riffe represented Monge but Ware and Ortiz were involved in the case. He could not remember if Ware, like Barriffe, was present for every appearance.
He testified that Monge identified his drug source as being Leovildo Granada. Woodfork did not know what connection Acevado may have had with Monge. He had not investigated Acevado and knew nothing about him. He never told anyone that Acevado was involved in the Monge case, nor was Acevado, to his knowledge, the subject of a surveillance. He did not know if Monge was a member of the “Black Tuna Gang”, and he said the “Black Tuna Gang” was not involved with the Monge case.
He also stated that there was no surveil-lence of the Monge family after the defendant’s arrest, and there likewise had never been a surveillence of the defendant’s grocery store. He never said that drugs were sold from the grocery, and he never felt that Mrs. Monge was involved in drug sales.
The autopsy protocol of Mario Acevado made by the coroner of St. Charles Parish, Louisiana, was introduced into evidence. It showed that the body of Mario Acevedo was found in St. Charles Parish in June, 1982 and that the decedent had died of a single gunshot wound to the head, not the 15 bullet wounds described by the plaintiffs.
All of the witnesses who testified at the hearing on the motion for new trial could have been called by plaintiffs to corroborate their invasion of privacy claims. They were not produced by the plaintiffs and, when called by the defendants, their testimony did not substantiate the charge of improper disclosure of confidential information to the Federal authorities. Their testimony not only failed to corroborate plaintiffs’ testimony but directly contradicted it.
Since the plaintiffs have failed to meet their burden of proving, by a preponderance of evidence, a cause of action for invasion of privacy, we find the jury verdict in this case to be erroneous and contrary to the law and evidence. Accordingly, the judgment of the district court is reversed insofar as it awarded damages to the plaintiffs for invasion of privacy.
Upon the issue of wrongful eviction, for the reasons stated herein, we find that the plaintiffs have failed to prove this cause of action. Accordingly, we render judgment in favor of the defendant on this issue.
The judgment of the district court is reversed. All costs of these proceedings are assessed against appellees.
REVERSED.